THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JAMES NOLAN, Appellant.

*Court* of *Appeals, June* 28, 1889.

1. *Criminal law.  Effect of amendment to section* 491 *et seq. of the Penal Code.*—By virtue of section 10 of chap. 489 of 1888 amending section 491 *et seq.* of the Penal Code, the provisions of said section, as they existed prior to the passage of said amendment, remain in force, unaffected by the repealing section in said amendatory act, so far as relates to such crimes committed before the act went into effect; and a person, convicted after January 1, 1889, when said act went into effect, of the crime of murder in the first degree, committed before that time, but after the passage of the act, is properly sentenced to death by hanging.
2. *Same.  Sufficient evidence.*—Evidence held sufficient to justify a verdict for murder in the first degree.

Appeal from a judgment of the court of general sessions of the peace, in and for the city and county of New York, entered upon a verdict, convicting defendant of the crime of murder in the first degree.

*Wm. F. Howe,* for appellant.

*John W. Goff,* assistant district attorney, for respondent.

PECKHAM, J.—The counsel for the defendant has argued two points before us, upon which he claims that the judg-

ment in this case should be reversed. He claims that the verdict was against the weight of evidence, and that, hence, justice requires a new trial, and also that the death penalty by hanging can no longer be inflicted in such a case as this, and that the statute of 1888, which provides for inflicting such penalty by means of electricity does not apply, or that if it did, it would be unconstitutional as being an *ex post facto* law.

A careful perusal of the evidence contained in the record leads us, without hesitation, to a perfect agreement with the jury in the verdict of murder in the first degree.

The killing is admitted, but it is alleged to have been perpetrated by the defendant while in such a mental state as to call for his acquittal on the ground of insanity. The evidence is clear and conclusive that no such immunity can properly be claimed for the defendant. It does not raise within us a shadow of doubt, that at the time of the homicide the defendant was of perfectly sound mind. That part of it which has been assumed proved the contrary, is so exceedingly weak and vague that it scarcely requires consideration.

There is some evidence which shows that the defendant, when a small boy, fell off the banisters as he was sliding down and hit his head, and remained unconscious for a couple of hours. Shortly after his mother's death, and when at the age of twelve, he awoke at night and told his brother that he had seen his mother, and called his attention to her, and his brother, much older, told him to " shut up and go to sleep." This is said to have been of somewhat frequent occurrence since, while sleeping with his brother. It seems always to have occurred at night, and no one other than his brother gave any testimony regarding it. He had one such so-called delusion about two weeks before the shooting, as the brother says. The brother also testified that once when the defendant was seventeen years of age he was overcome with the heat, and the counsel for the

defendant, who was then examining the witness, at once suggested that it was a sunstroke, and the brother assented, and added that he disremembered whether he was unconscious or not, but that he was sick about a week. It is entirely evident that there was no sunstroke about it. The defendant at the time of the trial was about twenty-three years of age and had been a hard drinker. He was also afflicted with syphilis in quite a severe form.

This completes the evidence which, it is alleged, shows the defendant to have been insane at the time of the homicide. No one had ever supposed that there was any mental derangement or unsoundness about him prior to that event. Nothing in his manner, actions, speeches or general course of life had ever led any one to suspect that the defendant differed in any respect from men whose mental condition was sound beyond all question. The evidence shows that he had been living with this unfortunate woman, and to a certain extent had been supported by her. She was a prostitute, and the immediate cause of the crime was her refusal to support defendant any longer, and also the fact that the defendant discovered that she was bestowing her favors upon another man, whom he found in the room with her a short time prior to the perpetration of the deed. He went away, purchased a pistol, brought a man with him back to the house, and both went in, and he called for her to come downstairs, saying that there was a man there who wanted to see her.

She finally came, when the man left, and the defendant sent the landlady into her own room, and there in the hall, with his hands upon the hall door leading into the street, to secure a means of retreat, he drew the pistol and fired at her five times, each shot taking effect, and the fatal one lodging in her abdomen. He then fled. When subsequently arrested, he stated that he had shot her because "she had shook" him, and he was angry, and did not know what he did.

This is the substance of the case, and we can but repeat our entire satisfaction with the verdict of the jury. A clearer case of deliberate and willful murder it would be difficult to show.

The second ground taken for a reversal of this judgment seems to us to be wholly free from merit.

If I have been able to understand the argument of the counsel for defendant, it is that the legislature in changing the manner of inflicting the death penalty from hanging by the neck to the application of electricity, has done it in so stupid a manner as to leave no method of inflicting the death penalty upon those who committed murder subsequent to the passage of the act and prior to the time when it went into operation (January 1, 1889), provided the trial took place after such date and the sentence was consequently then pronounced.

The act amended those sections of the Code of Criminal Procedure which related to carrying out the punishment of death by hanging, and substituted in their place the provisions requiring the application of electricity as therein stated, and it repealed all acts and parts of acts inconsistent with its provisions..

But by section 10 it was enacted as follows: "Nothing contained in any provision of this act applies to a crime committed at any time before the day when this act takes effect. Such crime must be punished according to the provisions of law existing when it is committed, in the same manner as if this act had not been passed; and the provisions of law for the infliction of the penalty of death upon convicted criminals, in existence on the day prior to the passage of this act, are continued in existence and applicable to all crimes punishable by death, which have been or may be committed before the time when this act takes effect. A crime punishable by death, committed after the beginning of the day when this act takes effect, must be

punished according to the provisions of this act, and not otherwise."

We are unable to see why this section is not a perfect answer to the argument of the counsel for the defendant. The claim seems to be that, by the eleventh section of the act, all acts and parts of acts inconsistent with its provisions were repealed, and therefore, as the amendments made by the prior sections of the act to those sections of the Code of Criminal Procedure, which provided for death by hanging, had wiped out such sections as originally enacted, there was no law left for inflicting the death penalty other than the sections as amended, which provided for its infliction by means of electricity, and that, as applied to defendant's case, such law was *ex post facto.*

This reasoning leaves out of view the provisions of section ten. The legislature, in that section, expressly enacted that nothing contained in any provision of the act should apply to a crime committed at any time before the day when the act took effect. It went further, and in so many words provided that as to such a crime, the punishment must be according to the old provisions in the same manner as if the act had not been passed.

The defendant's counsel gives a force to the repealing words of section eleven, which the legislature expressly enacts they should not have. He says they repeal all acts prior to the repealing of the sections of the Code relative to the infliction of the death penalty, and as the Code directed that the defendant was to be punished according to its provisions, the prior laws were not applicable to the defendant's case, who was thus left, according to counsel's contention, to be punished according to the Code as it now exists, not as it existed heretofore, as, by the amendment, its former provisions were repealed.

I am not sure that I have perfectly comprehended the position taken by the counsel for the defendant, but this is his argument as I understand it from his brief. The diffi-

culty and the whole difficulty with it is as I have already suggested. It wholly ignores the provisions and effect of the tenth section, the saving clause of the act.

By reason of such clause, the sections of the Code, as they existed prior to the passage of the act, remain, for all purposes therein stated, in full force and effect, exactly the same as if no act of amendment, alteration or repeal had ever been passed, and, on that account, and for that reason, the law in force in this state, so far as the defendant is concerned, remains as it was before January 1, 1889, and all its provisions relating to the infliction of the death penalty by hanging, are saved and continued.

No amount of reasoning or argument can make this plainer, than it is made by the statute itself, and further amplification would only tend to confuse what is now clear and unambiguous.

The judgment should be affirmed.


All concur, except FINCH, J., absent.